# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **AUDREY LYNN HOWELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **2:16-cv-00007-AKK** |
| **BAPTIST HEALTH SYSTEM, INC.,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

Audrey Lynn Howell brings this case against Baptist Health System, Inc. ("Baptist")[1] under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e *et seq.* She alleges that Baptist required her to work in an environment tainted by pervasive sexual harassment and retaliated against her for lodging complaints related to that harassment. Howell also brings two state law claims against Baptist—assault and battery and negligent supervision. Baptist has filed a motion for summary judgment on all of Howell's claims, doc. 38, and that motion is now fully briefed, docs. 42; 45; 48, and ripe for review. Based on a thorough examination of the parties' briefs and the record, the court finds that summary judgment in favor of Baptist is due to be granted with respect to

---

[1] Because of Baptist's corporate structure, another business entity is also named as a defendant. However, the same legal analysis is applicable to both entities so, for ease of reference, this court will refer to Baptist as the sole defendant in the case.

Howell's Title VII hostile work environment claim, and denied as to the Title VII retaliation claim and the state law claims.

## II. Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255. Indeed, it is explicitly not the role of the court to "weigh conflicting evidence or to make credibility determinations." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996); *see also Anderson*, 477 U.S. at 255 (explaining "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Nor will "a . . . 'scintilla of evidence in support of the nonmoving party . . . suffice to overcome a motion for

summary judgment.'" *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (quoting *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004)). Instead, if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" and summary judgment is appropriately granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

## III. Facts

The following facts reflect an assessment of the record in the light most favorable to Howell. Howell worked for Baptist for over 25 years in various administrative capacities. Doc. 45 at 1. In November 2013, while serving as the clinic manager for Baptist's clinic in Gardendale, Alabama, Howell began working several days each week at the Baptist clinic in Pinson, Alabama. *Id.* at 1–2; Doc. 42 at 5. Baptist eventually offered Howell a position as clinic manager at the Pinson location. Doc. 42 at 5. Although Howell initially declined this offer, she went on to accept the position in January 2014. *Id.* at 6. As clinic manager in Pinson, Howell "directly managed all clinic staff except for physicians." *Id.*

Shortly after starting her new position, Howell was confronted with poor morale among the staff along with a variety of other problems. Doc. 39-55 at 5–10, 19–21. Howell's testimony reveals that virtually all of these problems pertained to staff-related difficulties with implementing various Baptist

administrative policies, dealing with challenging hourly requirements, and working with one of the clinic physicians, Dr. Walter Wilson. *Id.*; Doc. 39-21 at 1–2. Dr. Wilson allegedly flaunted Baptist procedures at every turn, micro-managed the staff, and frequently used profanity in the office. *Id.* Although Dr. Wilson had no direct supervisory authority over Howell, she alleges that he had the final say regarding employment and disciplinary decisions in the clinic, and that he operated the Pinson facility as his own private business with little oversight from Baptist. Docs. 39-55 at 7–9, 11, 18–19; 44-1 at 3. Howell also alleges that Dr. Wilson frequently ignored Baptist's rules and guidelines in his practice, and that he instructed his staff to do the same. Doc. 39-55 at 11, 19.[2]

## A. Sexual Harassment in the Workplace

Almost all of the facts supporting Howell's allegations of sexual harassment stem from a single incident in March of 2014. Doc. 42 at 7. On the day of the incident, a front-office employee purportedly tricked Howell into a private, closed door meeting with Adam Goldweber, an outside pharmaceutical sales representative and, allegedly, a person who had previously engaged in sexually harassing behavior at the Pinson clinic. Doc. 39-55 at 16–17. In his meeting with Howell, Goldweber, who Howell asserts was a friend of Dr. Wilson's, made a

---

[2] Howell points out that her attempts to enforce corporate policy were met with significant resistance at the Pinson clinic. Indeed, she asserts that she was frequently called "the bitch," or referred to as "the biggest bitch in town" by both staff and Dr. Wilson based on her attempts to follow Baptist's workplace guidelines. Doc. 39-55 at 10, 28.

series of inappropriate comments including referring to a "lesbian affair" conducted by a previous clinic manager and claiming that he was "a very controlled lover . . . [who] could rock [Howell's] world." *Id.* at 16.

Howell understandably became extremely uncomfortable and ended the conversation immediately. She then reported the encounter to Dr. Wilson, who purportedly told her not to complain about the incident because of his friendship with Goldweber. *Id.* at 16–17. Dr. Wilson also took the opportunity to make a series of inappropriate comments including: (1) a reference to the previous clinic manager having sex with Goldweber; (2) a reference to the previous clinic manager's "camel toe;" and (3) looking down Howell's blouse while telling Howell she should appreciate men who looked at her breasts because "humans are the only people that have sex looking at each other." *Id.*; Doc. 45 at 9. Bizarrely, Dr. Wilson also gave Howell a "head noogie," a term the parties use to refer to Dr. Wilson's practice of grabbing another person's head and pressing his forehead against their face. Docs. 39-55 at 25; 45 at 9. Including this incident, Howell asserts that she received five "head noogies" from Dr. Wilson. Doc. 39-55 at 25.

In addition to the Goldweber episode, Howell points to one other significant harassing event. Purportedly, Dr. Wilson summoned Howell into his office and asked her to pick out her body type in an open *Sports Illustrated* swimsuit magazine on his desk. *Id.* at 18. Although Howell declined to do so, Dr. Wilson

attempted to pressure her into accepting his request by noting which body type he thought Howell possessed and telling her "[y]ou've got the body . . . just pick it out." *Id.*; Doc. 45 at 10. At the conclusion of this interaction, Dr. Wilson gave Howell another "head noogie," apparently in an attempt to lighten the mood. Doc. 39-55 at 18.

Howell further alleges that Dr. Wilson twice called her into his office so that he could look at her butt, *id.* at 37, that he routinely cursed and demeaned women in her presence, and that he instructed her to only send pharmaceutical sales reps to meet with him if they were at least a 34C in bra size. *Id.* at 6, 8–11, 37, 43; Docs. 44-2 at 2; 45 at 3. Additionally, Howell claims that Dr. Wilson posted both sexually explicit and racially derogatory images on his office door. Doc. 39-55 at 22–23. Howell asserts that she promptly reported all of these incidents to her supervisors in Baptist's corporate office, as well as to a third party human resources consultant working with the staff at the Pinson clinic. *Id.* at 18–19, 22, 36.

### B. Retaliation

In addition to the alleged incidents of sexual harassment, Howell further avers that Dr. Wilson made a number of racially derogatory statements which she also reported to Baptist. These comments mostly involved Dr. Wilson's adamant opposition to the hiring of African-Americans. In one instance, Dr. Wilson

explained that he would not "have a mother fucking [racial epithet] working here." *Id.* at 11. Dr. Wilson repeated this racial epithet in several other contexts around the office, and he maintained a bulletin board by his office which included a derogatory cartoon of President Barrack Obama. *Id.* at 8–9, 22. After Howell reported these highly offensive remarks to Baptist, Dr. Wilson confronted Howell and raised his voice at her stating "Let me make this goddamn clear. I hire my own people. I've told you that. Not them . . . I am pissed that you have made that complaint. . . I hire my own goddamn mother fucking people." *Id.* at 18. Allegedly Dr. Wilson also informed Howell that she would lose her job if she continued her complaints. *Id.*

Similarly, after Dr. Wilson learned that Howell had reported Goldweber to Baptist, he confronted her twice in her office telling her he was "pissed" she had chosen to report the incident despite his request that she not do so. *Id.* at 37. He also purportedly instructed Howell to "get [her] head out of corporate's ass." Doc. 39-58 at 32. These allegedly retaliatory actions replicated a pattern of behavior in which Dr. Wilson belittled Howell and her adherence to Baptist's rules and regulations by, among other things, labelling her "the biggest bitch" for attempting to follow proper workplace protocol. Doc. 39-55 at 10, 28.

All of these events occurred in the roughly three and a half months between when Howell began working full time at the Pinson clinic and when she took

medical leave in May 2014.  Doc. 44-2 at 2.   During her leave, Howell continued to communicate with Baptist regarding the conditions in Pinson.  Doc. 42 at 14–19. Based on these conversations, Baptist administrators met with Dr. Wilson and informed him that Baptist would not renew his contract.  *Id.* at 18–19; Doc. 45 at 18.  Howell never returned to work following her medical leave.  Doc. 42 at 14.

## IV. Discussion

Howell's complaint primarily focuses on her Title VII allegations regarding both sexual harassment and the retaliation she allegedly suffered when she reported Dr. Wilson's racially discriminatory conduct to Baptist.  She also raises two parasitic state law torts, assault and battery and negligent hiring, training, supervision, and retention linked to Dr. Wilson's inappropriate workplace behavior.  This court addresses each of Howell's claims in turn.

### A. *Title VII Hostile Work Environment*

To prevail on her hostile environment claim, Howell must show

(1) that . . . she belongs to a protected group; (2) that [she] has been subject to unwelcome sexual harassment . . . ; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (en banc) (quoting *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc)).

Although Title VII clearly provides protection against sexual harassment, the Supreme Court has cautioned courts against construing it as a "federal 'civility code.'" *Mendoza*, 195 F.3d at 1245 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). Indeed, "not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). Thus, "'simple teasing,' . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citation omitted). Instead, sexual harassment must be "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor*, 477 U.S. at 67 (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)).

The inquiry into whether sexual harassment has risen to the level required to alter the conditions of employment includes both a subjective and an objective component. *Mendoza*, 195 F.3d at 1246. Thus, the victim of harassment must "subjectively perceive the environment to be abusive" and, objectively, the work

environment must qualify as one that "a reasonable person would find hostile or abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). This inquiry is conducted in light of the totality of the circumstances and includes a variety of considerations including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23.

Baptist primarily argues that Howell has failed to establish that the alleged harassment was objectively severe or pervasive. That is, Baptist claims that Howell has failed to demonstrate, in light of the totality of the circumstances, that her working environment was abusive enough to alter the terms and conditions of her employment. Based on this record, the court agrees.

As a threshold matter, the court reiterates that to qualify as sex or gender based harassment, the harassing behavior must "have been based on the sex of the employee." *Mendoza*, 195 F.3d at 1245. Thus, only incidents based on Howell's sex are appropriately taken into account when assessing her hostile environment claim. Although undoubtedly bizarre, Howell has not put forward evidence indicating that Dr. Wilson's practice of giving Howell "head noogies" was because of her status as a woman or that these "intimidating" "head noogies" were sexual in nature. Accordingly, these instances, as well as Dr. Wilson's racially

discriminatory remarks, have no bearing on whether Howell's sexually hostile environment claim survives summary judgment.[3]

A fair reading of Howell's deposition testimony suggests strongly that her primary workplace concerns relate to the general atmosphere of dysfunction at the Pinson clinic rather than to targeted sexual harassment. Howell spends considerable time discussing the lack of training on standard Baptist administrative and billing practices provided to the staff and doctors and the lack of interest employees exhibited in following Baptist guidelines. Doc. 39-55 at 5–11, 19–21. Howell also repeatedly emphasizes the lack of support Baptist provided to her efforts to increase compliance with corporate policy from clinic staff and the "closed social system" that existed in Pinson during her period of employment there. *Id.* at 7, 9–10, 20–21, 28; Doc. 39-21 at 1–2. Although Howell's efforts to address these workplaces difficulties were laudable and the circumstances she experienced in the clinic were difficult and undoubtedly stressful, these issues are

---

[3] Howell asserts that the court should still consider the "head noogies" and racial comments as part of her hostile environment claim because the Eleventh Circuit recognizes a Title VII action for a "retaliatory hostile environment." This argument confuses two distinct causes of action. A hostile environment claim based on sex harassment requires proof that "the harassment [creating the hostile environment was] based on the sex of the employee." *Mendoza*, 195 F.3d at 1245. On the other hand, when raising a "retaliatory hostile environment claim," there must be a "causal link" between the protected activity and the adverse employment action, or hostile work environment. *Gowski v. Peake*, 682 F.3d 1299, 1311–12 (11th Cir. 2012). That is, the plaintiff must demonstrate that the hostile environment was created for retaliatory purposes. Each claim, therefore, contains a distinct causal component requiring a particularized connection between some protected characteristic, either based on status or activity, and the hostile environment. Here, as discussed, Howell has provided no basis for a court to conclude the "head noogies" were based on Howell's protected status as a woman. So, as discussed *infra*, this court considers those actions solely in the retaliation context.

not legally actionable concerns under Title VII. Stated differently, that an office is not well-run or efficient has no bearing on whether an employer has violated an employee's federally protected civil rights. *See, e.g.*, *Davis v. Town of Lake Park*, 245 F.3d 1232, 1244 (11th Cir. 2001) (remarking that "Title VII is not designed to make federal courts 'sit as a super-personnel department that reexamines an entity's business decisions.'") (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)).

However, Howell does point to the following instances of sexual harassment to support her claim: the Goldweber incident and the inappropriate comments Dr. Wilson made when Howell reported the event to him, the incident that occurred when Dr. Wilson attempted to pressure Howell into selecting her body type from an open *Sports Illustrated* swimsuit magazine, Dr. Wilson's practice of using language physically objectifying women, his practice of posting "sexual-type" pictures on his officer door, and the fact that Dr. Wilson and the office staff sometimes referred to Howell as a "bitch" based on her practice of seeking compliance with Baptist corporate policies. Docs. 39-55 at 6, 8–11, 16–18, 28; 44-2 at 2. Howell does not allege that Dr. Wilson or anyone else ever touched in a sexually suggestive manner.

The actions alleged by Howell are disturbing and clearly inappropriate, but, as the Eleventh Circuit has repeatedly made clear, "Title VII is not a civility code,

and not all profane or sexual language or conduct will constitute discrimination in the terms and conditions of employment." *Reeves*, 594 F.3d at 807. Indeed, "Title VII does not prohibit profanity alone, however profane. It does not prohibit harassment alone, however severe and pervasive. Instead, Title VII prohibits discrimination, including harassment that discriminates based on a protected category such as sex. . . [a]n equal opportunity curser does not violate [the] statute." *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1301–02 (11th Cir. 2007). Moreover, the harassment in question must be so severe as to support a conclusion that the "workplace is permeated with 'discriminatory intimidation, ridicule, and insult.'" *Harris*, 510 U.S. at 21 (quoting *Meritor*, 477 U.S. at 65). Here, Howell has simply not alleged sufficient conduct to meet this difficult evidentiary threshold.

First, Howell does not suggest that she was touched inappropriately, or that anyone even attempted to touch her in an inappropriate manner. Nor does she claim that she was subjected to a deluge of sexually suggestive comments or propositions for sex. Instead, Howell specifically indicates she was exposed to sexually risqué comments on three or four occasions over about four months making the purported harassment she experienced too infrequent to establish an objectively hostile environment. *See, e.g.*, *Guthrie v. Waffle House, Inc.* 460 F. App'x 803, 807 (11th Cir. 2012) (explaining that "a few dozen comments or

actions . . . spread out over a period of eleven months," was insufficient evidence of frequency); *Mendoza*, 195 F.3d at 1242, 1247–48 (finding that frequency "[was] for the most part lacking" when considering four concrete instances of unwanted harassment and "constant" following and "obvious" staring over an eleven month period).  Howell has made no showing that she was harassed on a daily or even weekly basis,[4] and her more general allegations simply reflect the sort of sporadic, boorish behavior that the Supreme Court has explained does not support a Title VII claim.  *See Faragher*, 524 U.S. at 788 (explaining that the severe and pervasive element of hostile environment claims is designed to filter out the "ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing") (quotation omitted).

Second, the conduct identified by Howell does not rise to the level of conduct that the Eleventh Circuit has previously identified as sufficiently severe to sustain a hostile environment claim.  *See, e.g.*, *Dar Dar v. Associated Outdoor Club, Inc.*, 248 F. App'x 82, 86 (11th Cir. 2007) (finding that two instances of employee's touching the plaintiff's buttocks and two risqué comments did not establish a hostile working environment); *Guthrie*, 460 F. App'x at 804, 807 (finding harasser grabbing the plaintiff's "butt two to five times" and several other

_____

[4] *See Reeves*, 594 F.3d at 812 (noting the frequency component of the hostile environment inquiry was satisfied because the plaintiff's co-workers made obscene and abusive comments on a daily basis); *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002) (finding frequency sufficient when plaintiff faced "ethnic slurs . . . three to four times a day").

instances of making vulgar, sexually explicit comments fell short of establishing a hostile working environment); *Mendoza*, 195 F.3d at 1247–53 (holding that a supervisor rubbing his hip against the plaintiff while touching her shoulder and smiling, "constantly" staring and following the plaintiff, and making "sniffing" sounds while looking at plaintiff's groin was insufficiently severe to establish a hostile environment claim). *But see Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1248 (11th Cir. 2004) (holding sufficient severity existed for a hostile environment claim when the relevant conduct included "many direct as well as indirect propositions for sex," including "following [the plaintiff] into the restroom, and repeated attempts to touch her breasts, place his hands down her pants, and pull off her pants," as well as "enlisting the assistance of others to hold [the plaintiff] while [attempting] to grope her"); *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (holding harasser's behavior was severe because he gave "[the plaintiff] unwanted massages, standing so close to [her] that his body parts touched her from behind, and pulling his pants tight to reveal the imprint of his private parts").

As distasteful as the conduct alleged here is, it amounts to "the sporadic use of abusive language . . . and occasional teasing," conduct that is not actionable under Title VII. *Faragher*, 524 U.S. at 788. In short, the harassment Howell alleges she endured is factually much closer to *Mendoza* or *Guthrie* than the types

of repeated sexual touching and vulgar propositions involved in cases like *Hulsey* and *Johnson*.

Perhaps recognizing the factual shortcomings of her allegations, Howell attempts to revive her sexual harassment claim by suggesting that she felt physically threatened and humiliated based on Dr. Wilson's temper and his vulgar language. Doc. 39-55 at 6, 17, 22–24, 26. However, Howell has not presented any evidence to establish that Dr. Wilson's temper and vulgar language was specifically directed at her based on her sex. *See Oncale* 523 U.S. at 80 (explaining the critical inquiry in claims of sexual harassment is "'whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed'" not merely that words are used in the workplace that may have a sexual connotation) (quoting *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring)). Indeed, it is established that the "mere utterance of an . . . epithet which engenders offensive feelings in a[n] employee, does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21 (internal citations and quotations omitted); *see also Oncale*, 523 U.S. at 81 (stating the "prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment"). While Howell may have felt physically threatened and humiliated,

she has failed to establish that this conduct was based on her sex, or that it was severe enough to have objectively altered the conditions of her employment.

Accordingly, in light of controlling Eleventh Circuit precedent, Howell has failed to put forward enough evidence to create an issue of material fact regarding whether she was subjected to objectively "severe or pervasive" harassment. Thus, summary judgment is due on Howell's hostile environment claim under Title VII.

B. Title VII Retaliation

Title VII provides a remedy for "employer retaliation on account of an employee's having opposed, complained of, or sought remedies for, unlawful workplace discrimination." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2522 (2013) (citing 42 U.S.C. § 2000e–3(a)). To establish a prima facie case of retaliation, the plaintiff is required to show that: "(1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). "[A] materially adverse action 'means [an action that] well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 974 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Further, Title VII retaliation claims require "proof that the desire to retaliate was

the but-for cause of the challenged [materially adverse] employment action."

*Nassar*, 133 S. Ct. at 2528.[5]

First, Baptist claims that Howell did not engage in any statutorily protected activity. According to Baptist, Howell's reports of Dr. Wilson's extremely inappropriate, and as Baptist admits, illegal, racial comments do not qualify as protected conduct because those comments were not directed towards Howell because of her race. This contention is irrelevant because Howell also complained about sexual harassment directed at her based on her sex. Doc. 39-55 at 36–37. And, even if Baptist's argument was potentially relevant here, it is inapposite. Contrary to Baptist's contention, the prima facie case for Title VII retaliation claims does not require membership in a protected class. Instead, in contrast to Title VII's substantive anti-discrimination provision, its "antiretaliation provision must be construed to cover a broad range of employer conduct." *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 173 (2011). Indeed, by its terms, the antiretaliation provision of Title VII, § 2000e-3(a), prohibits retaliation "'against

---

[5] Baptist does not contest the existence of a direct causal link between the alleged retaliatory conduct and any protected activity. And, Dr. Wilson's own conduct reveals the existence of such a link as Howell alleges that Dr. Wilson threatened her job and physically intimidated her after stating he was angry about her complaints. Doc. 39-55 at18; 37; s*ee Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (explaining that direct evidence is "'evidence, which if believed, proves [the] existence of [the] fact in issue without inference or presumption'") (quoting *Rollins v. Techsouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987)). Accordingly, even if Baptist had presented evidence supporting a non-retaliatory basis for Dr. Wilson's actions, this court could not grant summary judgment in its favor. *Id.* at 1190–91.

any of [the employer's] employees' for engaging in protected conduct." *Id.* at 174 (quoting *Burlington*, 548 U.S. at 62).

There is simply no warrant, statutory or otherwise, for requiring membership in a protected class in order to state a claim based on retaliation. *See, e.g.*, *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000) (explaining "there is no qualification on who the individual doing the complaining may be or on the party to whom the complaint is made known . . .").  Therefore, because it is otherwise undisputed that complaining to superiors regarding racially discriminatory workplace practices qualifies as statutorily protected behavior under Title VII, *see Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998) (pointing out that "reporting alleged race discrimination" counts as statutorily protected conduct), Baptist's argument fails as a matter of law.  Accordingly, this court finds that Howell's alleged complaints regarding both racially discriminatory hiring practices and sexual harassment qualify as protected conduct for purposes of her Title VII retaliation claim.

Baptist next argues that Howell did not and could not have suffered an adverse employment action based on her complaints.  To support this contention, Baptist asserts that Dr. Wilson lacked supervisory authority over Howell and, to the extent any retaliation occurred, it was not serious enough to qualify as adverse

because it failed to deter Howell from reporting future discrimination. Neither argument is convincing.

First, on this record, the argument that Dr. Wilson lacked supervisory authority over Howell is a non-starter. Even accepting that Dr. Wilson was not technically authorized to take disciplinary action against Howell pursuant to Baptist's guidelines, Howell has put forward sufficient evidence to indicate that the Pinson clinic ran according to Dr. Wilson's wishes. Specifically, Howell testified that Dr. Wilson had the power to hire and discharge employees, that he frequently ignored Baptist's policies, and that he informed Howell repeatedly that he had complete authority over clinic operations. Docs. 39-21 at 1–2; 39-55 at 11, 19, 37; 44-1 at 3; 44-2 at 2–3.

Significantly, Sandra Ash, an outside human resources consultant who investigated employee complaints, prepared a report on the Pinson clinic further reinforcing this conclusion. Doc. 42 at 9–10. The report indicated that Pinson clinic employees thought that Dr. Wilson had the authority to ignore Baptist's rules and that his favored employees could freely "go over the line" with his blessing. Doc. 39-21 at 1–2. Taken as a whole, and given the substantial evidence put forward suggesting Dr. Wilson's virtually unchecked power over the operation of Pinson clinic, these incidents create an issue of material fact regarding whether Dr.

Wilson had disciplinary authority over Howell. In light of the procedural posture of the case, this court must infer that he did, in fact, have such authority.[6]

The argument that Howell did not suffer an adverse employment action based on her protected conduct is equally unavailing. The law is clear that a materially adverse employment action in this context is simply an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68 (quotation omitted); *see also Booth v. Pasco Cty.*, 757 F.3d 1198, 1206–07 (11th Cir. 2014) (upholding a verdict in which the jury found that forcing the plaintiffs to undergo fitness-for-duty examinations based on the filing of EEOC complaints constituted "adverse employment action" for retaliation purposes); *Crawford*, 529 F.3d at 973 n.13 (explaining that *Burlington* "strongly suggests that it is for a jury to decide whether

---

[6] Baptist further asserts that Howell was not chilled or dissuaded from complaining about discriminatory behavior because she actually raised further complaints regarding Dr. Wilson's behavior in addition to filing an EEOC charge after she left for her medical leave. Doc. 42 at 25. Putting aside the fact that the inquiry is objective rather than subjective, this argument is unpersuasive. At the time Howell made these additional complaints, she had already been out on medical leave for more than a month. *Id.* at 14. Thus, she was logically no longer subject to Dr. Wilson's retaliatory behavior. And, in any event, the key question is not whether Howell was herself dissuaded from making or supporting complaints of discrimination, but whether a reasonable employee in her position would have been. *See Foshee v. Ascension Health-IS, Inc.*, 384 F. App'x 890, 892 (11th Cir. 2010) (stating the "materiality of the alleged adverse action is judged by an objective standard"); *Crawford*, 529 F.3d at 974 (explaining that the Supreme Court has instituted a purely objective standard of whether an action "'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination'" to judge materiality in the Title VII retaliation context) (quoting *Burlington*, 548 U.S. at 68). As discussed *infra*, Howell has made the necessary showing for her claim to survive at this stage of the proceeding.

anything more than the most petty and trivial actions against an employee should be considered 'materially adverse.'").

Here, there is evidence that after Howell complained about being sexually harassed by Goldweber, Dr. Wilson confronted Howell in her office and noted that he was "pissed" about the report. Doc. 39-55 at 37. Previously, Dr. Wilson had also admonished Howell not to report the event, a confrontation during which he administered a "head noogie" to Howell, a direct act of physical intimidation. *Id.* at 16–17, 25. Further, on at least three occasions following the Goldweber incident, Dr. Wilson approached Howell in the hall and again administered a "head noogie." *Id.* at 25. A reasonable person could certainly take this behavior as Dr. Wilson's attempt to continue to physically intimidate Howell to prevent her from raising additional complaints.

Likewise, after Howell reported racially discriminatory comments made by Dr. Wilson, he approached her angrily telling her, in part, that he hired his "own goddamn mother fucking people," and threatening her with discharge if she did not back off. *Id.* at 18. These repeated confrontations involving both direct physical confrontation and fiscal threats, and coupled with Dr. Wilson's purported disciplinary authority over Howell, are sufficient to create a question of material fact regarding whether a reasonable employee in Howell's position would have

been deterred from making future complaints. Accordingly, Baptist's motion regarding Howell's retaliation claim fails.

### C. Assault & battery

Baptist does not deny that Dr. Wilson's practice of giving "head noogies" qualifies as both an assault and a battery under Alabama law. Doc. 42 at 29–30. Similarly, there is no dispute that this behavior occurred on at least five occasions. *Id.* at 29. Baptist argues only that there is no legal basis for subjecting it to liability for Dr. Wilson's conduct. Under Alabama law, an employer is only liable for the intentional torts of its employees if: "'[1] the agent's wrongful acts were in the line and scope of his employment; or [2] that the acts were in furtherance of the business of [the employer]; or [3] that [the employer] participated in, authorized, or ratified the wrongful acts.'" *Potts v. BE & K Constr. Co.*, 604 So. 2d 398, 400 (Ala. 1992) (quoting *Joyner v. AAA Cooper Transp.*, 477 So. 2d 364, 365 (Ala. 1985)).

Howell does not contend that Dr. Wilson's acts were within the scope of his employment, or that he gave the "head noogies" in furtherance of Baptist's business. Howell instead argues that she presented sufficient evidence to demonstrate that Baptist ratified Dr. Wilson's behavior. To make this showing, Howell must prove that Baptist "(1) had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited

upon the complaining employee; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted . . . a continuing tort; and (3) that the employer failed to take 'adequate' steps to remedy the situation." *Mardis v. Robbins Tire & Rubber Co.*, 669 So. 2d 885, 889 (Ala. 1995) (citing *Potts*, 604 So. 2d at 400).

Baptist argues that it could not have ratified Dr. Wilson's practice of giving "head noogies" because Howell only reported the admittedly tortious conduct in an email dated June 12, 2014, after Howell had taken an extended medical leave of absence from which she would never return. However, this contention ignores Howell's deposition testimony in which she asserts that she orally reported the "head noogies" to Baptist personnel—Justin Barnett, the Director of Operations for the Pinson clinic and Gillian Jackson, a Baptist employee working in the human resources department. Doc. 39-55 at 23–24. Baptist's policy on workplace harassment specifically permits verbal complaints, so there is no indication that Howell's oral report failed to meet Baptist's guidelines. Doc. 42 at 21. Therefore, because for purposes of summary judgment "[t]he evidence of the non-movant is to be believed," *Anderson*, 477 U.S. at 255, Howell's testimony is sufficient to create an issue of material fact regarding whether Baptist had actual knowledge of Dr. Wilson's behavior. Consequently, Baptist's motion on this claim fails.

## D. Negligent Hiring, Training, Supervision, and Retention

Under Alabama law, to support a claim of negligent hiring, training supervision, "the allegedly incompetent employee [must have] committed a common-law Alabama tort." *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002) (citing *Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 824 (Ala. 1999)).[7] Because Alabama does not "recognize an independent cause of action for sexual harassment," *Ex parte Carlisle*, 26 So. 3d 1202, 1204 n.1 (Ala. 2009) (quotation omitted), Howell must allege additional independent conduct capable of supporting an Alabama tort claim. *See, e.g.*, *McCaulley v. Harvard Drug Grp., LLC*, 992 F. Supp. 2d 1192, 1197–99 (N.D. Ala. 2014) (canvassing relevant case law to determine that claims for hostile work environment and retaliation under Title VII require the allegation of independent conduct supporting an Alabama tort claim in order to substantiate a claim of negligent hiring, training, supervision, and retention).

Howell has done so. Neither party disputes that the "head noogies" constitute an independently actionable tort under Alabama state law, and it is the assault and battery claim based on this behavior that underlies Howell's claim of

---

[7] The plaintiff must also show that the employer ratified this underlying tort based on actual knowledge of the tortious conduct and "'that based upon this knowledge, the employer knew, or should have known, that [the offending employee's] conduct constituted sexual harassment and/or a continuing tort; and . . . that the employer failed to take 'adequate' steps to remedy the situation.'" *Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 824 (Ala. 1999) (quoting *Potts*, 604 So. 2d at 400).

negligent hiring, training, supervision, and retention. As already discussed, Howell has established an issue of material fact regarding whether Baptist ratified Dr. Wilson's tortious behavior, and therefore her claim for negligent hiring, training, supervision, and retention survives Baptist's motion.

## V. CONCLUSION AND ORDER

For the foregoing reasons, Baptist's Motion for Summary Judgment, doc. 38, is **GRANTED** as to Howell's Title VII claim for sexual harassment and **DENIED** as to her other claims. Howell's Title VII claim for sexual harassment is **DISMISSED** with prejudice.

**DONE** the 11th day of October, 2017.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE